1   **KOREIN TILLERY**
    Steven A. Katz
2   skatz@koreintillery.com
    Aaron M. Zigler
3   azigler@koreintillery.com
    One U.S. Bank Plaza
4   505 N. 7th St., Suite 3600
    St. Louis, MO 63101-1625
5   Tel: (314) 241-4844  Fax: (314) 241-3525

6   [Additional Counsel Appear on Signature Page]

7   *Attorneys for Plaintiffs.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

C.M.D., by his next friend Jennifer E. DeYong, T.A.B. by her next friend Patricia A. Isaak, and H.E.W. & B.A.W., by their next friend Jami A. Lemons, A.D.Y & R.P.Y., by their next friend Robert L. Young, Jr., and R.R.C., by her next friend Robyn S. Courtway, individually and on behalf of all others similarly situated, et al., individually and on behalf of all others similarly situated,

    Plaintiffs,

v.

FACEBOOK, INC.,

    Defendant.

Case No.  3:12-cv-01216

**PLAINTIFFS' SECOND AMENDED COMPLAINT**

Courtroom:

Judge: Hon. Richard Seeborg

Trial Date: None set

*(sidebar)* KOREIN TILLERY  *Attorneys at Law*

      Plaintiffs, individually, and on behalf of all others similarly situated**,** by their undersigned counsel, on information and belief, and for their Complaint against Defendant Facebook, Inc. state as follows:

      1.      Through this matter, Plaintiffs challenge Facebook's practice of using children's names and pictures in advertisements without consent. The unpermitted use of a person's identity in the advertising of goods or services represents the "clearest case" of infringement of the right of publicity, 2 J. Thomas McCarthy, *Rights of Publicity and Privacy* § 7:8 (2d ed. 2011), a state-law created intellectual property right defined as "the inherent right of every human being to

control the commercial use of his or her identity" infringement of which is a commercial tort of unfair competition.1 *Rights of Publicity and Privacy* § 1:3. This is not merely a right of celebrities, but is a right inherent to everyone entitling them to damages for an unpermitted taking. *Id*. Plaintiffs bring this action in order to put an end to Facebook's illegal practice and to recover their statutory damages. The action targets all of Facebook's premium priced social advertisements—unlike the *Fraley* action, whose claims focused on "Sponsored Stories," exclusively.  Sponsored Stories, as explained herein, are only one of the Facebook's premium priced social advertisements in its "inventory" for sale to advertisers that infringe on its users rights of publicity by transforming its users' names, profile pictures and actions into an apparent commercial endorsement.  However, this case is only brought by minors who are Facebook members and where claims are asserted for putative class or classes, the constituents of such class are, or were during some portion of the Class Period, minors.

**PARTIES, JURISDICTION AND VENUE**

2.      C.M.D. is the minor child of Jennifer E. DeYong both of whom are natural persons and citizens and residents of the Southern District of Illinois. C.M.D. is a Facebook user, who during a time that Facebook records identified him to be under the age of 18, had his name, profile picture or social activity used in connection with a Facebook advertisement without consent.

3.      T.A.B. is the minor child of Patricia A. Isaak both of whom are natural persons and citizens and residents of the Southern District of Illinois. T.A.B. is a Facebook user, who during a time that Facebook records identified him to be under the age of 18, had his name, profile picture or social activity used in connection with a Facebook advertisement without consent.

4.      H.E.W. and B.A.W. are the minor children of Jami A. Lemons each of whom are natural persons and citizens and residents of the Southern District of Illinois. H.E.W. and B.A.W. are Facebook users, who during a time that Facebook records identified them to be under the age of 18, had their name, profile picture or social activity used in connection with a Facebook advertisement without consent.

KOREIN TILLERY
*Attorneys at Law*

Case No. 12-cv-01216
Plaintiffs' Second Amended Complaint

5.      A.D.Y and R.P.Y. are the minor children of Robert L. Young, Jr. each of whom are natural persons and citizens and residents of the Southern District of Illinois. A.D.Y. and R.P.Y. are Facebook users, who during a time that Facebook records identified them to be under the age of 18, had their name, profile picture or social activity used in connection with a Facebook advertisement without consent.

6.      R.R.C. is the minor child of Robyn S. Courtway both of whom are natural persons and citizens and residents of the Southern District of Illinois. R.R.C. is a Facebook user, who during a time that Facebook records identified her to be under the age of 18, had her name, profile picture or social activity used in connection with a Facebook advertisement without consent.

7.      All references to "Plaintiff(s)" throughout this Complaint are made on behalf of the named Plaintiffs and the proposed plaintiff class(es), and vice versa.

8.      The amount in controversy in this action, as defined by 28 U.S.C. § 1332(d)(6), exceeds $5,000,000, exclusive of costs and interest.

9.      Defendant is a citizen of the States of California and Delaware as defined by 28 U.S.C. § 1332(c), as it is a Delaware company with its principal place of business in Menlo Park, California.

10.      Defendant operates an interactive website, Facebook.com, from datacenters located throughout the Country.

11.      This action was originally brought in the United States District Court for the Southern District of Illinois on June 1, 2011, and pursuant to Defendant's 28 U.S.C. § 1404(a) motion, it was transferred to this District on March 8, 2012. Defendant is a resident of the Southern District of Illinois as it is has ongoing and systematic contacts with residents of the Southern District of Illinois. Defendant has, at all material times, conducted business including the operation of interactive websites and the sale of advertising to residents of the Southern District of Illinois. Moreover, Defendant has specifically targeted the residents of Illinois as users and advertisers such that sufficient minimum contacts exist with the State of Illinois that the assumption of jurisdiction will not offend traditional notions of fair play and substantial justice.

Case No. 12-cv-01216
Plaintiffs' Second Amended Complaint

12.     When reference in this Complaint is made to any act or omission of Defendant, it should be deemed to mean that the officers, directors, agents, employees, or representatives of Defendant committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendant, and did so while acting within the scope of their employment or agency.

## STATEMENT OF FACTS

**A. The Company**

13.     Facebook is a social networking service and website launched in February 2004 that is operated and privately owned by Facebook, Inc. Registration with Facebook requires that a user provide his or her name, gender, date of birth, and a valid email.

14.     Registered Users (also referred herein as "members") are asked to also provide the name of their high school, college, and employer to create a User profile. Users can expand their profile by adding information about various interests and hobbies. They can also add contact information including address, website, email and phone numbers. Users may add other users as "friends" and exchange messages, including automatic notifications when they update their profile.

15.     Although Facebook does not charge for membership to its site, it would be inaccurate to call Facebook membership free. Facebook receives tremendous value from each of its users. Facebook's primary source of income is the sale of advertisements which are made more attractive to advertisers by Facebook's ability to collect personal information compiled from its users' and their families and acquaintances' profiles, demographic information, and activities on Facebook and other sites and target ads accordingly.  Exclusive control over this information is also valuable to each user. A recent study valued demographic information at approximately $3.00 per year; contact information $4.20 per year; a person's hobbies, interest, religious and political views $4.60 per year; web browsing histories $52.00 per year; location history $55.00 per year; and access to chat logs, text messages and emails was valued at $59.00 per year.

KOREIN TILLERY
*Attorneys at Law*

Case No. 12-cv-01216
Plaintiffs' Second Amended Complaint

KOREIN TILLERY
*Attorneys at Law*

16.     Facebook distinguishes itself from other social media sites in several ways.  One way is by requiring that users utilize their true identities.  For example, Facebook publicly states:

> Facebook has always been based on a real name culture. This leads to greater accountability and a safer and more trusted environment for our users. It's a violation of our policies to use a fake name or operate under a false identity, and we encourage people to report anyone they think is doing this, either through the report links we provide on the site or through the contact forms in our Help Center. We have a dedicated User Operations team that reviews these reports and takes action as necessary. We will consider removing a profile if we determine that it is not authentic and false information is being communicated on it. We also have technical systems in place to flag and block potential fakes based on name and anomalous site activity.

17.     Facebook also distinguishes itself from other sites in that it in that it purposefully seeks out children to be members. As the Ninth Circuit recently observed, Google, Netflix, eBay, Twitter and Amazon all have prohibited minors from using their websites. *United States v. Nosal*, 676 F.3d 854, 861 (9th Cir. 2012). Facebook, however, allows and even encourages children as young as the age of 13 to become members of its site.

18.     Sources estimate that as of April 2010, 41.6% of the U.S. population has a Facebook account. Although originally only open to students at certain universities, Facebook opened itself to high-school-aged users in September 2005 and on September 26, 2006, to everyone 13 and older with a valid email address. Sources estimate more than 14 million U.S. residents under the age of 18 are Facebook users.

**B.   Facebook's Business Model and Advertising Products**

19.     Facebook's primary means of revenue generation is from the sale of advertising that is targeted to its users based upon Facebook's massive collection of personal information.

20.     When advertisers create an ad campaign with Facebook, they specify the types of users they would like to reach based on age, location, gender, relationship status, educational history, workplace, and interests. Advertisers choose to pay for their ads based on either cost per thousand impressions (the number of users who are presented the ad) or on a cost per click basis.

21.     As a result, Facebook can increase its ad revenues by increasing its total membership base, the number of ads to which those users are exposed, or the likelihood an ad is clicked, its response rate.

22.     According to Facebook's most recent Annual Report on Form 10-K, Facebook's business plan for generating and revenue is:

How We Create Value for Marketers

> We focus on providing value for all kinds of marketers, including brand marketers, direct marketers, small and medium-sized businesses, and developers by offering a unique combination of reach, relevance, social context, and engagement:

> Any brand or business can have a presence on Facebook by creating a Facebook Page. Through Pages, we give brands the opportunity to form direct and ongoing relationships with their existing and prospective customers, ***with the potential to turn them into valuable advocates***.  [Emphasis supplied]  When a Facebook user "Likes" a Page, the Page owner has the opportunity to publish stories to the person's News Feed on an ongoing basis.  We believe that this ongoing connection provides businesses with a significant advantage as compared to advertising on traditional websites.  Facebook offers products and tools that enable marketers to leverage our unique combination of reach, relevance, social context, and engagement.  Ads with social context allow marketers to highlight the interactions of a user's friends with a brand or product, such as Liking or Commenting on the marketer's Facebook Page.

23.     Beginning in 2007, in an effort to both increase its user base and an ad's response rate, Facebook begin associating the names and profile pictures its users, as apparent endorsements, with advertisements for its services and other products and services for which it is paid to promote.

24.     Facebook accomplishes this by first matching an individual user, through examination of Facebook's collection of personal information about that user, to criteria established by Facebook or by a paid advertiser.

25.     Facebook then combines the selected user's name and profile picture with an advertisement for one of its services or a paid advertiser's logo and Facebook authored text and design elements to create "targeted" "enhanced" "premium" and "social" advertisements and "Sponsored Stories" that transform its users' names, profile pictures and actions into an apparent commercial endorsement. Facebook then presents these apparent endorsements to others.

26.     Facebook advertisers pay a premium for ads that utilize members' likeness and social activity both for social ads and "Sponsored Stores" advertising products sold by Facebook.

KOREIN TILLERY
*Attorneys at Law*

Case No. 12-cv-01216
Plaintiffs' Second Amended Complaint

27.     Facebook maintains sole control over whether a user's personal information is associated with an advertisement or presented to others. A user cannot choose to be associated with an ad nor can a user supply a picture or text to be used in an endorsement ad for which she is selected. Users are not provided with the algorithm underlying the selection of their personal information for use as an endorsement and are denied information concerning the advertiser sponsoring the ad. Similarly, although an advertiser may select particular demographics to target, advertisers do not select which user's personal information is used in the creation of the endorsement.

28.     Facebook acknowledges that it offers two separate advertising products that utilize a user's name and likeness:

> Only two Facebook marketing products, Sponsored Stories and Social Ads, use the names or profile pictures of users. Sponsored Stories allow a business or organization to pay Facebook to redisplay a story about a user's social actions (for example, "Jane Doe likes Barack Obama") to the same group of Facebook Friends to which the user had originally published the story. Social Ads permit third parties to pay Facebook to display a user's social actions alongside content created by the business or organization, when such third-party content is shown to someone to whom the user had originally published his or her story (for example, "Jane Doe likes Barack Obama" might appear next to an advertisement created by President Obama's presidential campaign shown to one of Jane Doe's Facebook Friends).

Facebook's Opp'n to Plaintiffs Mem. of Points and Authorities re Potential Stay of Proceedings, ECF No. 142, at 3.

29.     One type of Social Ad that utilizes a user's name and likeness is a Premium Ad. Facebook pitches Premium Ads to its customers (and buyers) as follows:

> PREMIUM ADS
>
> Facebook provides marketers the chance to advertise their products and brands in premium locations.
>
> Premium Ads enables users to interact with your ad by taking simple social actions, for example: Liking your page, responding to a poll, RSVP'ing to your event or requesting a sample of your product.  Users can take these actions without even leaving Facebook. Once a user has interacted with a Premium AD, information about this interaction is displayed in your ad.  Ads featuring the endorsement of trusted friends or "ads with friends" are more relevant and engaging for your audience.

*See* Exhibit 1.

30.     Facebook's Premium Inventory also includes "Premium Like Ad":
> Premium Like Ads drive user engagement by letting Facebook users see how many of their friends have already liked your brand.

KOREIN TILLERY
*Attorneys at Law*

1      ***

2      The Premium Like Ad can have news stories about friends associated with it.

3      *See* Exhibit 2.

4      31.     Facebook's Premium Inventory also includes:

5      "Premium Poll Ads" explained as Premium Poll Ads encourage interaction with your brand by asking a question and letting people instantly see the results.

6      ***

7      The user can also click on a link to see how their friends voted and/or liked the brand.

8      *Id.*

9      32.     Facebook's Premium Inventory also includes, Premium Video Comment Ad

10     which is explained as:

11     Share a compelling video about your brand and watch what people have to say.

12     ***

13     Comments made by a user's friends are seen below the ad, increasing their trust and propensity to engage with the ad.  The act of commenting or liking is public and may appear as Friend's news feeds.

14

15     *Id.*

16     33.     All of the foregoing Premium Ads are separate and distinct from Sponsored

17     Stories and are marketed in conjunction with Sponsored Stories, not as substitutes:

18     Sponsored Stories are different from ads, and including them in your Facebook Premium Ad campaign amplifies the actions your target audience takes with your Premium Ads during a Target Block or Sustained Media.

19

20     34.     In its advertising products inventory, Facebook also includes allowing advertisers

21     to "include context about activity people [Facebook members] have taken with your object, such

22     as liking your Page, using your product, attending your event.  This context will be shown to

23     friends of these people if they are in your target audience."

24     35.     On or around January 25, 2011, Facebook launched an advertising service called

25     "Sponsored Stories."  Sponsored Stories function like its Social Ad products in that they turn

26     user's actions into what appears to be a personally endorsed advertisement.  The Sponsored

27     Stories advertisement service is enabled for all Members. Members are unable to opt-out of the

28     service.

KOREIN TILLERY
*Attorneys at Law*

Case No. 12-cv-01216
Plaintiffs' Second Amended Complaint

36. Each of these social context/endorsement ads derive their value from the use of the Facebook members' image, social activity and/or endorsement. Facebook appropriates all of that value for itself without the users' express affirmative consent. Facebook promotes the ability to use its use its users' personal data as a commercial endorsement to market products and services by stating:

> "Friends of connections" targeting allows you to target the friends of users already connected to your onsite content. Connections are fans of your Page, users who have RSVP'd "Yes" or "Maybe" to your Event, members of your Group, and users who have interacted with your Application.
>
> When people see ads for Pages, Events and Apps their friends have already connected with, the ads will be personalized with the names of those friends. This generates powerful word of mouth for your business or brand.
>
> In addition to harnessing the social graph by targeting your connections' friends, every "Friends of connection" targeted ad promoting a Page or Event includes social content about a friend's interaction with your business, amplifying the relevancy of your ad. Let's take a look at an example. Annie likes the Etsy Page. When Etsy wants to promote their Facebook Page, they can choose to target an ad to Annie's friends by selecting the "Friends of connection" filter. Annie's friends will receive the Etsy ad with the following sentence: "Annie likes this Page." Annie's friends are naturally more interested because Annie's interaction with Etsy is showcased directly in the ad.

37. The industry recognizes the value to advertisers of a user's social activity information. In a recent New York Times article it was reported "Verizon announced in December that its customers could authorize it to share that information [site visits etc.] in exchange for coupons." Claire Cain Miller, Somini Sengupta, The New York Times, *Selling Secrets of Phone Users To Advertisers*, Oct. 5, 2013. In April 2010, Facebook and the Nielsen Company published the results of a six-month research study of the effect of apparent endorsement advertisements on more than 800,000 Facebook users. Jon Gibs and Sean Bruich, *Advertising Effectiveness: Understanding the Value of a Social Media Impression* (Apr. 2010), www.nielsen.com/content/dam/corporate/ us/en/reports-downloads/SocMediaImpressions_US_rpt_4.19.10.pdf.

38.     This study found that the addition of apparent endorsements "strongly impact" the three key measures of an advertisement's effect. The study documented a 60% increase in ad recall, a 100% increase in ad awareness and a 300% increase in purchase intent. *Id.* at 7.

39.     Accordingly, associating a user's name and profile picture as an apparent endorsement measurably increases the value of advertisements to both the advertiser and Facebook. The value of the apparent endorsement is measurable both on an individual and class-wide basis.

**C. Facebook's Use of Minors' Identities Violates Their Legal Rights**

40.     Plaintiffs are some of the many Facebook users whose names and profile pictures Facebook used in advertisements, including both social ads and Sponsored Stories, as an apparent endorsement of products and services, s*ee, e.g.*, ECF Nos. 90-1, 90-2, 90-3, for which Facebook received additional revenue as a result.

41.     However, state law prohibits the unauthorized use of a person's name or likeness for commercial purposes. *See e.g.*, Restatement (Second) of Torts § 652C (1977) ("One who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy."); *Invasion of privacy by use of plaintiff's name or likeness in advertising*, American Law Reports, 23 A.L.R.3d 865 ("One whose name or likeness is used, without his consent, in advertising, has a right to recover for an invasion of privacy."); 765 ILCS 1075 ("A person may not use an individual's identity for commercial purposes during the individual's lifetime without having obtained previous written consent."... "A person who violates [this section] may be liable for ... $1,000.")

42.     Despite the value of their apparent endorsements, Facebook failed to obtain legal consent to use Plaintiffs' names or profile pictures in advertisements and Plaintiffs were not paid for the use of their name or likeness in connection with the advertisement. As of August 2013, Facebook proposed embedding in its dense policy statements a purported "representation" by the minor as follows:  "you represent that at least one of your parents or legal guardians has also agreed to the terms of the section and the use of your name, profile picture, content and

1    information on your behalf." This term is intended to provide Facebook legal protection against

2    claims of unauthorized infringement of a child's right to publicity.

3        43.    Nonetheless, Defendant used and continues to use Plaintiffs' names and

4    photographs for the purpose of marketing, advertising, selling and soliciting the purchase of

5    goods and services without express legal consent, thus misappropriating Plaintiffs' rights to

6    publicity.

7        44.    This misappropriation deprives Plaintiffs of their financial interest in their inherent

8    right to control the use of their identity causing them actual financial harm.

9                            **CLASS ACTION ALLEGATIONS**

10       45.    This action is brought as a class action by Plaintiffs on behalf of themselves and on

11   behalf of all those similarly situated pursuant to Rule 23(b)(2) of the Federal Rules of Civil

12   Procedure on behalf of the following class:

13               All Facebook users in the United States, who during a time that
14               Facebook records identified them to be under the age of 18, had
                 their name or profile picture used in connection with a Facebook
15               advertisement. (the "Class" or "Class Members").

16       46.    This action is brought as a class action by Plaintiffs on behalf of themselves and on

17   behalf of all those similarly situated pursuant to Rule 23(b)(3) of the Federal Rules of Civil

18   Procedure on behalf of the following subclass:

19               All Facebook users, who during a time that Facebook records
                 identified them to be under the age of 18 and a resident of Illinois
20               and had their name used in connection with a Facebook
21               advertisement. (the "Illinois Sub-Class" or "Sub-Class Members").

22               Specifically excluded from all proposed classes are: any Judge
                 conducting proceedings in this action and their parents, spouses and
23               children as well as any other member of their family residing in the
                 judge's household; counsel of record in this action; the legal
24               representatives, heirs, successors and assigns of any excluded
                 person.

25       47.    The exact number of the members of the class (or sub-classes) is not presently

26   known, but is so numerous that joinder of individual members in this action is impracticable. The

27   exact number of the members of the class (or sub-classes) can only be ascertained through

28   discovery, because such information is in the exclusive control of Defendant. However, based on

KOREIN TILLERY
*Attorneys at Law*

the nature of the activities alleged herein, Plaintiffs believe that the members of the class (or sub-classes) number at least in the hundreds of thousands and are geographically dispersed throughout the United States. The names and addresses of the members of the class (or sub-classes) are readily obtainable from the Defendant and its agents and on information and belief are maintained in the computer database of Defendant and are easily retrievable.

48.     Plaintiffs will fairly and adequately protect the interests of the class and sub-classes and have retained counsel that are experienced and capable in class action litigation, and in the fields of technology and consumer law. Plaintiffs understand and appreciate their duties to the class and sub-classes under Fed. R. Civ. P. 23 and are committed to vigorously protecting the rights of absent members of the class and sub-classes.

49.     Plaintiffs are asserting claims that are typical of the claims of each member of the class and sub-classes they seek to represent, in that the claims of all members of the class and sub-classes, including Plaintiffs, depend upon a showing that the Defendant's practices are unlawful. All claims alleged on behalf of the class and sub-classes flow from this conduct as well. Further, there is no conflict between any Plaintiff and other members of the class or sub-classes with respect to this action.

50.     There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented. Questions of law and fact arising out of Defendant's conduct are common to all members of the class and or sub-classes, and such common issues of law and fact predominate over any questions affecting only individual members of the class and sub-classes.

51.     Common issues of law and fact include, but are not limited to, the following:

    a.   Whether California law governs the validity of the Statement of Rights and Responsibilities ("SRR");

    b.   Whether Defendant's SRR is void, voidable or enforceable;

    c.   What state law(s) govern the legality of Defendant's association of users' names or profile pictures with advertisements;

KOREIN TILLERY
Attorneys at Law

KOREIN TILLERY
*Attorneys at Law*

d. Whether Defendant's association of users' names or profile pictures with advertisements infringes on class members' right of publicity;

e. Whether Defendant acted with consent;

f. Whether Defendant is entitled to immunity under the Communications Decency Act § 230;

g. Whether Plaintiffs' claims are pre-empted by the Children's Online Privacy Protection Act, 15 U.S.C. §§ 6501-6506.

h. Whether Plaintiffs and the members of the class (or sub-classes) are entitled to punitive damages and/or civil penalties; and

i. The proper measure of punitive damages and/or civil penalties.

52.   The relief sought is common to the entirety of the class and sub-classes.

53.   Defendant has acted on grounds generally applicable to the class (or sub-classes), thereby making final injunctive relief or corresponding injunctive relief appropriate with respect to the class as a whole.

54.   This action is properly maintained as a class action in that the prosecution of separate actions by individual members would create a risk of adjudication with respect to individual members which would establish incompatible standards of conduct for the Defendant.

55.   This action is properly maintained as a class action in that the adjudications with respect to individual members of each class (or sub-classes) which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication, or would substantially impair or impede their ability to protect their interests.

56.   A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein given that, among other things:

a. significant economies of time, effort, and expense will inure to the benefit of the Court and the parties in litigating the common issues on a class-wide instead of a repetitive individual basis;

b. the size of the individual damages claims of most members of the class (or sub-classes) is too small to make individual litigation an economically viable

KOREIN TILLERY
*Attorneys at Law*

alternative, such that few members of the class (or sub-classes) have any

interest in individually controlling the prosecution of a separate action;

c.  without the representation provided by Plaintiffs herein, few, if any, members

of the class (or sub-classes) will receive legal representation or redress for their

injuries;

d.  class treatment is required for optimal deterrence;

e.  despite the relatively small size of the claims of many individual members of

the class (or sub-classes), their aggregate volume, coupled with the economies

of scale inherent in litigating similar claims on a common basis, will enable

this case to be litigated as a class action on a cost effective basis, especially

when compared with repetitive individual litigation;

f.  no unusual difficulties are likely to be encountered in the management of this

class action;

g.  Plaintiffs and the members of the class (or sub-classes) have all suffered

irreparable harm and damages as a result of Defendant's unlawful and

wrongful conduct;

h.  absent a class action, Defendant will likely retain millions of dollars received

as a result of its wrongdoing, and its illegal, unfair, false and misleading

conduct shall go unremedied and uncorrected; and

i.  absent a class action, the members of the class (or sub-classes) will not receive

restitution, will continue to suffer losses, and Defendant will be allowed to

retain the proceeds of its ill-gotten gains.

57.     Concentrating this litigation in one forum would aid judicial economy and

efficiency, promote parity among the claims of the individual members of the class (or sub-

classes), and result in judicial consistency.

**COUNT I**
(DECLARATORY RELIEF UNDER 28 U.S.C. § 2201)

58.     Plaintiffs incorporate the allegations contained in Paragraphs 1 through 57 as if

fully set out herein.

59.     Defendant contends that its SRR constitues a valid and enforcable contract that, among other things, provides that its users agree to the commercialization of their identity by providing:

> your name and profile picture may be associated with commercial, sponsored, or related content (such as a brand you like) served or enhanced by us. You give us permission to use your name and profile picture in connection with that content, subject to the limits you place.

Facebook's SRR at ¶ 10.

60.     The American legal tradition has consistently acknowledged that "during the formative years of childhood and adolescence, minors often lack. . . experience, perspective, and judgment," *Bellotti v. Baird*, 443 U.S. 622, 635 (1979), as well as "the ability to make fully informed choices that take account of both immediate and long-range consequences." *Id.* at 640.

61.     In fact, "as any parent knows. . ., a lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults. . . .  These qualities often result in impetuous and ill-considered actions and decisions." *Roper v. Simmons*, 543 U.S. 551, 569 (2005). To that end, federal and state legislatures have limited the rights and duties of children and adolescents in order to act "in their interest by restricting certain choices that we feel they are not yet ready to make with full benefit of the costs and benefits attending such decisions." *Thompson v. Oklahoma*, 487 U.S. 815, 825 n.23 (1988).

62.     In recognition of the comparative immaturity and irresponsibility of juveniles, almost every State prohibits those under 18 years of age from voting, serving on juries, making a will, or marrying without parental consent.

63.     For these same reasons, California law forbids minors from entering into a contract that purports to "give a delegation of power" or that relates to "any personal property not in the immediate possession or control of a minor." Cal. Fam. Code § 6701 (West 2004).

64.     Facebook's Statement of Rights and Responsibilities contains a choice-of-law clause designating California law. As such, California law will govern the issue of its validity, even if doing so render the contract void. *See, e.g., Foreman v. George Foreman Associates, Ltd.*, 517 F.2d 354, 357 (9th Cir. 1975).

KOREIN TILLERY
*Attorneys at Law*

65. Accordingly, Plaintiffs contend that they (and a significant portion of Facebook's users) are legally incapable of consenting to Facebook's commercialization of their identities because they are under the age of 18, and, as a result, Facebook's claim that its minor users consented to the commercialization of their identity must fail as a matter of law.

66. Facebook's SSR violates Code § 6701 as it purports to give a delegation of power and relates to personal property not in the immediate possession or control of a minor.

67. The SRR clearly seeks to delegate authority to Facebook. *Sisco v. Cosgrove*, 51 Cal. App. 4th 1302, 1307 (1996) ("a minor cannot contract with respect to a future interest"). Likewise, the right to control the commercial use of one's name and likeness is a "property right." *Lugosi v. Universal Pictures*, 25 Cal. 3d 813, 818-19 (1979). And this property right to publicity is not in the immediate possession or control of the person asserting the property right. *See, e.g., Morgan v. Morgan*, 220 Cal. App. 2d 665, 675 (1963) (right to future wages are not personal property in a minor's possession); *ETW Corp. v. Jireh Publ'g*, 332 F.3d 915, 928 (6th Cir. 2003) ("the right of publicity is an intellectual property right").

68. Contracts that are contrary to Section 6701 are "absolutely void, with no necessity to disaffirm [it] to avoid [its] apparent effect." *Hakes Inv. Co. v. Lyons*, 137 P. 911, 912 (Cal. 1913); *Duffens v. Valenti*, 161 Cal. App. 4th 434, 451 (2008) ("Contracts that are contrary to express statutes or to the policy of express statutes ... are illegal contracts. Any such illegality voids the entire contract.").

69. Plaintiffs contend that by reason of the facts alleged above, Facebook's SRR is void and of no legal force and effect as between plaintiffs and Facebook. Alternatively, the SRR is governed by Family Code § 6702 and is voidable at the discretion of Plaintiffs and Class Members.

70. Nevertheless, Facebook has raised numerous provisions of its SRR in its defense to this and other matters.

71. As of August 2013, Facebook proposed modifing these terms as follows:

You give us permission to use your name, profile picture, content, and information in connection with commercial, sponsored, or related content (such as a brand you like) served or enhanced by us. This means, for example, that you permit a business or other

KOREIN TILLERY
*Attorneys at Law*

entity to pay us to display your name and/or profile picture with your content or information, without any compensation to you. If you have selected a specific audience for your content or information, we will respect your choice when we use it.

If you are under the age of eighteen (18), or under any other applicable age of majority, you represent that at least one of your parents or legal guardians has also agreed to the terms of this section (and the use of your name, profile picture, content, and information) on your behalf.

Proposed SRR at 10.1

72.     Facebook similarly contends that such "consent" satisfies any legal obligation it may have to obtain proper consent to contract with a minor and otherwise grants Facebook the unfettered right to use a child's name or likeness for commercial purposes.

73.     The existence of Facebook's claims in the face of Family Code § 6701 injects unnecessary uncertainty into the rights and responsibilities of the parties. Given the number of children who are Facebook members and the increasing number of disputes challenging Facebook's conduct, Facebook is likely to assert its SRR as a defense to claims involving minor users for the foreseeable future.

74.     Plaintiffs request that this court enter a declaratory judgment as to the rights and duties of plaintiffs and defendants with respect to the SRR and that such judgment find the SRR to be absolutley void; enter a Temporary Restraining Order pursuant to Fed. R. Civ. P. 65(b), restraining defendant, its successors, agents and employees, and all other persons in active concert and participation with them from enforcing the terms of the SRR against Plaintiffs; and enter preliminary and permanent injunctions pursuant to Fed. R. Civ. P. 65, enjoining defendant, its successors, agents and employees and all persons in active concert and participation with them from enforcing the terms of the SRR against Plaintiffs.

## COUNT II
### (DECLARATORY RELIEF UNDER 28 U.S.C. § 2201)

75.     Plaintiffs incorporate the allegations contained in Paragraphs 1 through 57 as if fully set out herein.

76.     At all times relevant hereto, Plaintiffs and Class Members were minor children and Facebook users.

KOREIN TILLERY
*Attorneys at Law*

Case No. 12-cv-01216
Plaintiffs' Second Amended Complaint

77.     Facebook contends that the Children's Online Privacy Protection Act, 15 U.S.C. 6501-6506 (2006) ("COPPA") preempts all of plaintiffs' claims herein.

78.     COPPA provides:

> No state or local government may impose any liability for commercial activities or actions by operators in interstate or foreign commerce in connection with an activity or action described in this title that is inconsistent with the treatment of these activities or actions under this action.

15 U.S.C. § 6502(d).

79.     Facebook has previously contended in this lawsuit that since plaintiffs' claims necessarily require parental consent on behalf of minors aged 13 or older, COPPA preempts such claims because requiring parental consent would be "inconsistent with the treatment of those activities under [COPPA]."

80.     COPPA does not exclude all state regulations because it refers only to "inconsistent" state laws.

81.     There is no actual conflict between COPPA and any of the Illinois or California statutes implicated by the claims in this lawsuit.

82.     Compliance by Facebook with the California and Illinois laws implicated by the claims in this lawsuit is not "impossible" and therefore neither is "inconsistent" with COPPA under 15 U.S.C. § 6502(d).

83.     The claims in this Complaint are consistent, not inconsistent, with COPPA as reflected in its legislature history, (statement of Rep. Bryan):  "COPPA's purpose is to enhance parental involvement in a child's online activities in order to protect the privacy of children in the online environment and to protect children's privacy by limiting the collection of personal information form children without parental consent."  Children's Online Privacy Protection Rule, 54 Fed. Reg. 59,888 (Nov. 3, 1999), 144 Comp. Rec. S11657 (daily ed. Oct. 7, 1998).

84.     The existence of Facebook's claims in the face of Family Code § 6701 injects unnecessary uncertainty into the rights and responsibilities of the parties. Given the number of children who are Facebook members and the increasing number of disputes challenging Facebook's conduct, Facebook is likely to assert its SRR as a defense to claims involving minor users for the foreseeable future.

KOREIN TILLERY
*Attorneys at Law*

KOREIN TILLERY
*Attorneys at Law*

85.     Plaintiffs request that this court enter a declaratory judgment as to the rights and duties of Plaintiffs and Class Members and Defendant find that Family Code § 6701 and State laws concerning the unauthorized use of a person's identity for commercial purposes are not preempted by COPPA.

### COUNT III
(INFRINGEMENT OF RIGHT OF PUBLICITY,
Illinois Right of Publicity Act – Social Ads)

86.     Plaintiffs incorporate the allegations contained in Paragraphs 1 through 57 as if fully set out herein.

87.     Because the SRR is void, neither party is able to demand performance of all or any part of the contract; including the choice of law clause. *Spinney v. Griffith*, 32 P. 974, 975 (Cal. 1893); *Fergus v. Songer*, 150 Cal. App. 4th 552, 573 (2007).

88.     "[W]hen the parties have failed to make a valid choice of law .... courts apply the traditional conflict-of-laws rules or engage in the "'most significant contacts'" analysis of the Restatement (Second) of Conflict of Laws." *Newman-Green, Inc. v. Alfonzo-Larrain R.*, 605 F. Supp. 793, 796 (N.D. Ill. 1985).

89.     As this case was transferred from an Illinois District court, this Court must apply the choice of law rules of Illinois. *Muldoon v. Tropitone Furniture Co.*, 1 F.3d 964, 966 (9th Cir. 1993) (*citing Van Dusen v. Barrack*, 376 U.S. 612, 642 (1964)).

90.     Under the Restatement, the state with the most significant relationship in a multi-state privacy action is usually the state where the plaintiff was domiciled. Restatement (Second) Conflicts of Laws § 153.

91.     At all times relevant hereto, Plaintiffs' and Sub-Class Members were minor children and Facebook users domiciled in Illinois.

92.     The right of publicity is codified in Illinois and provides that "[a] person may not use an individual's identity for commercial purposes during the individual's lifetime without having obtained previous written consent from the appropriate person ...." 765 Ill. Comp. Stat. 1075/30.

93. Defendant used and continues to use Plaintiffs' and Sub-Class Members' names and likenesses for the purpose of marketing, advertising, selling and soliciting the purchase of goods and services through their appearance in Social Ads knowing that Plaintiffs, as minors, lack the capacity to consent to such use and the Plaintiffs were domiciled in Illinois and the advertisements would be displayed in Illinois.

94. Further, Defendant knowingly used and continues to use Plaintiffs' and Sub-Class Members' names and photographs for the purpose of marketing, advertising, selling and soliciting the purchase of goods and services through their appearance in Social Ads without the consent of Plaintiffs' parents or guardians and knowing that it had not obtained consent of Plaintiffs' parents or guardians.

95. The addition of Plaintiffs' and Penalty State Sub-Class Members' names and likenesses as apparent endorsements result in a 60% increase in ad recall, a 100% increase in ad awareness and a 300% increase in purchase intent.

96. Accordingly, the commercial use of Plaintiffs and Sub-Class Members' names and likenesses has a tangible value measurable both on an individual and class-wide basis.

97. Defendant gained pecuniary benefit from the unauthorized use of Plaintiffs' and Sub-Class Members' names and photographs. These acts resulted in Defendant receiving millions of dollars in revenue as a result of its illegal activities.

98. Despite the value of their apparent endorsements, Facebook failed to obtain legal consent to use and Plaintiffs were not compensated for the use of their names and photographs for the purpose of marketing, advertising, selling and soliciting the purchase of goods and services and thereby deprived of the monetary value of the use of their name and photographs associated with the advertisement.

99. This misappropriation deprives Plaintiffs of their financial interest in their inherent right to control the use of their identity causing them actual financial harm.

100. As a direct and proximate result of the Defendant's use of Plaintiffs' and Sub-Class Members' names and photographs without legal consent or payment, Plaintiffs suffered actual damages including the financial loss of the value of the use of their identity for the

Case No. 12-cv-01216
Plaintiffs' Second Amended Complaint

KOREIN TILLERY
*Attorneys at Law*

apparent endorsement and invasion of the statutory right to exert exclusive control over their identity.

101.    Facebook's acts give rise to statutorily-authorized damages in the absence of actual damages.

## COUNT IV

(INFRINGEMENT OF RIGHT OF PUBLICITY –
Illinois Right of Publicity Act – Sponsored Stories)

102.    Plaintiffs incorporate the allegations contained in Paragraphs 1 through 57 as if fully set out herein.

103.    Because the SRR is void, neither party is able to demand performance of all or any part of the contract; including the choice of law clause. *Spinney v. Griffith*, 32 P. 974, 975 (Cal. 1893); *Fergus v. Songer*, 150 Cal. App. 4th 552, 573 (2007).

104.    "[W]hen the parties have failed to make a valid choice of law .... courts apply the traditional conflict-of-laws rules or engage in the "'most significant contacts'" analysis of the Restatement (Second) of Conflict of Laws." *Newman-Green, Inc. v. Alfonzo-Larrain R.*, 605 F. Supp. 793, 796 (N.D. Ill. 1985).

105.    As this case was transferred from an Illinois District court, this Court must apply the choice of law rules of Illinois. *Muldoon v. Tropitone Furniture Co.*, 1 F.3d 964, 966 (9th Cir. 1993) (*citing Van Dusen v. Barrack*, 376 U.S. 612, 642 (1964)).

106.    Under the Restatement, the state with the most significant relationship in a multi-state privacy action is usually the state where the plaintiff was domiciled. Restatement (Second) Conflicts of Laws § 153.

107.    At all times relevant hereto, Plaintiffs' and Sub-Class Members were minor children and Facebook users domiciled in Illinois.

108.    The right of publicity is codified in Illinois and provides that "[a] person may not use an individual's identity for commercial purposes during the individual's lifetime without having obtained previous written consent from the appropriate person ...." 765 Ill. Comp. Stat. 1075/30.

KOREIN TILLERY
*Attorneys at Law*

Case No. 12-cv-01216
Plaintiffs' Second Amended Complaint

109.    Defendant used and continues to use Plaintiffs' and Sub-Class Members' names and photographs for the purpose of marketing, advertising, selling and soliciting the purchase of goods and services through their appearance in Sponsored Stories knowing that Plaintiffs, as minors, lack the capacity to consent to such use and the Plaintiffs were domiciled in Illinois and the advertisements would be displayed in Illinois.

110.    Further, Defendant knowingly used and continues to use Plaintiffs' and Sub-Class Members' names and photographs for the purpose of marketing, advertising, selling and soliciting the purchase of goods and services through their appearance in Sponsored Stories without the consent of Plaintiffs' parents or guardians and knowing that it had not obtained consent of Plaintiffs' parents or guardians.

111.    The addition of Plaintiffs' and Penalty State Sub-Class Members' names and likenesses as apparent endorsements result in a 60% increase in ad recall, a 100% increase in ad awareness and a 300% increase in purchase intent.

112.    Accordingly, the commercial use of Plaintiffs and Sub-Class Members' names and likenesses has a tangible value measurable both on an individual and class-wide basis.

113.    Defendant gained pecuniary benefit from the unauthorized use of Plaintiffs' and Sub-Class Members' names and photographs. These acts resulted in Defendant receiving millions of dollars in revenue as a result of its illegal activities.

114.    Despite the value of their apparent endorsements, Facebook failed to obtain legal consent to use and Plaintiffs were not compensated for the use of their names and photographs for the purpose of marketing, advertising, selling and soliciting the purchase of goods and services and thereby deprived of the monetary value of the use of their name and photographs associated with the advertisement.

115.    This misappropriation deprives Plaintiffs of their financial interest in their inherent right to control the use of their identity causing them actual financial harm.

116.    As a direct and proximate result of the Defendant's use of Plaintiffs' and Sub-Class Members' names and photographs without legal consent or payment, Plaintiffs suffered actual damages including the financial loss of the value of the use of their identity for the

Case No. 12-cv-01216
Plaintiffs' Second Amended Complaint

apparent endorsement and invasion of the statutory right to exert exclusive control over their identity.

117.    Facebook's acts give rise to statutorily-authorized damages in the absence of actual damages.


WHEREFORE, Plaintiffs and the Class pray that the Court enter judgment in their favor and against Defendant as follows:

    a.   Ordering that this action be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

    b.   Declaring Facebook's actions unlawful and its SRR to be void pursuant to 28 U.S.C. § 2201;

    c.   Declaring that this action is not preempted by COPPA pursuant to 28 U.S.C. § 2201;

    d.   Enjoining Facebook from continuing to use the names and likenesses of Plaintiffs and the Class Members in its advertising practices;

    b.   Awarding Plaintiffs and Class Members statutory damages, pre- and post-judgment interest, costs of suit, and attorneys' fees; and

    c.   Awarding any other relief the Court deems just and proper.


Dated: October 15, 2013


By____/s Aaron M. Zigler_____
One the attorneys for Plaintiffs

Steven A. Katz
Aaron M. Zigler
KOREIN TILLERY
505 N. 7th Street, Suite 3600
St. Louis, MO 63101
Tel.    (314) 241-4844
Fax.    (314) 241-3525

Edward A. Wallace
Amy E. Keller
WEXLER WALLACE LLP

KOREIN TILLERY
*Attorneys at Law*

Case No. 12-cv-01216
Plaintiffs' Second Amended Complaint

55 West Monroe Street, Suite 3300
Chicago, IL 60603
Tel.      (312) 346-2222
Fax.      (312) 346-0022

Lee Squitieri
SQUITIERI & FEARON, LLP
32 E. 57th Street, 12th Floor
New York, NY 10022
Tel.      (212) 421-6492
Fax.      (212) 421-6553

KOREIN TILLERY
*Attorneys at Law*

Case No. 12-cv-01216
Plaintiffs' Second Amended Complaint